Charles A. Tyler v. Commissioner.
Tyler v. Commissioner
Docket No. 362.
United States Tax Court
1944 Tax Ct. Memo LEXIS 293; 3 T.C.M. (CCH) 329; T.C.M. (RIA) 44116; April 8, 1944
*293 Frank B. Murdoch, Esq., 123 S. Broad St., Philadelphia, Pa., for the petitioner. W. J. McFarland, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against the petitioner for the year 1939 in the amount of $1,324.99. The question for determination is whether petitioner is entitled, in computing his net income, to deduct $3,393.49 as an ordinary and necessary expense, as a bad debt, or as a loss. Findings of Fact Most of the facts were stipulated and are found as stipulated. The petitioner is a resident of Philadelphia, Pennsylvania. and filed his income tax return for the year 1939 with the Collector of Internal Revenue in that city. He is president and general manager of the Philadelphia Inquirer and has held that position since 1934. In 1931 petitioner was vice president and treasurer of Curtis-Martin Newspapers, Inc., which published the Public Ledger, a daily newspaper in Philadelphia; he was vice president of the Philadelphia Inquirer, which Curtis-Martin Newspapers, Inc., purchased in 1930; and was vice president and secretary of the New York Evening Post, also owned by Curtis-Martin *294 Newspapers, Inc. In addition to the above, he was vice president of the Public Ledger Company Building and Loan Association, which had been organized in 1920. Most of the stockholders of this association, possibly 90 to 95 percent, were employees of the Public Ledger, the Philadelphia Inquirer and the Curtis Publishing Company. A man by the name of Curtis was head of the three companies last mentioned. In the performance of his dutles with the Public Ledger and the New York Evening Post, petitioner was required to deal with the employees and the labor unions represented thereby. On Saturday, October 3, 1931, the United Security Title & Trust Company, a Philadelphia bank, sometimes referred to as United Security, closed its doors and failed to reopen on the following Monday. The Building and Loan Association above had on deposit with the closed bank $24,024.25 of its funds. It had $30,000 on deposit with the Tradesmens National Bank in Philadelphia. On the morning of October 5, 1931, the treasurer of the Building and Loan Association advised petitioner that some of the stockholders had been inquiring about the effect on the association of the failure of United Security. They were *295 concerned about their savings in the Building and Loan Association and some were demanding that their money be refunded. The petitioner on that date was the owner of 300 shares of stock in the Building and Loan Association, which had an actual value of $16,063.60, and a paid-in value of $14,470. Both the actual value and the paid-in value stated are the amounts shown after adjustment to reflect a prior stock loan of $5,000 to petitioner. John C. Martin, who was president of both Curtis-Martin Newspapers, Inc., and the Building and Loan Association, had stock in the association substantially in excess of that of petitioner. By noon of October 5, 1931, the number of stock-holders demanding refund of the money paid in to the Building and Loan Association had reached such proportions that a serious situation was created. After consultation with Martin, a letter signed by him and petitioner and directed to John C. A. Rigney, treasurer of the Building and Loan Association, was posted at the cashier's window and the stockholders, or a majority thereof, were satisfied to allow their funds to remain in the association. The letter in question reads as follows: "October 5, 1931. "Mr. John *296 C. A. Rigney, Treasurer Public Ledger Co. Bldg. & Loan Ass'n. "Dear Mr. Rigney: "Mr. Martin, as President of the Public Ledger Co. Building and Loan Association, and I, as Vice President, agree to underwrite the amount of deposit of the Association funds at the United Security, up to $20,000.00, so that the Association will suffer little, if any, loss. "This letter is written as a reassurance to the Stockholders of the Association, and that they may know that the closing of United Security does not seriously affect their interests. Very truly yours, CHAS. A. TYLER, APPROVED JOHN C. MARTIN." By april of 1939 the United Security Title & Trust Company had paid 44 percent on deposits, and the Building and Loan Association, by reason of such payment, had received $10,570.41 on its deposit. It was anticipated that an additional 11 percent would be paid, which payment would bring to the Building and Loan Association the additional amount of $2,642.61. There had been some demand that petitioner and Martin make good on their agreement of October 5, 1931, to underwrite the amount of the deposit up to $20,000. The petitioner had felt that additional time should be allowed for further liquidation *297 of the bank's assets, and no official action, making demand on him by the Building and Loan Association, was taken until April 13, 1939, when a resolution was adopted making formal demand on Martin and petitioner for payment of the difference between the $20,000 guaranteed and the sum of the amount received and the amount of the further dividends anticipated. The petitioner had appeared with his attorney at a previous meeting of the board of directors on March 31, 1939. In April of 1939, the petitioner paid to the Building and Loan Association the amount of $3,393.49 and received a release from all liability under the writing of October 5, 1931. There was no assignment by the Building and Loan Association to petitioner of any rights in any amounts that might thereafter be received from the assets of the closea bank. In April 1939, when the payment to the Building and Loan Association under the writing of October 5, 1931, was made, the petitioner did not own any stock in the Building and Loan Association. Opinion Petitioner contends, first, that the payment in question was as to him an ordinary and necessary expense, paid in the taxable year, in the carrying on of his business, and *298 in the alternative, that if it was not an ordinary and necessary expense, it was a debt determined to be worthless in the taxable year, or a capital loss, and, in either event, deductible in determining his net income. The facts, in our opinion, fail to show that the payment in question was an ordinary and necessary expense paid by the petitioner in the carrying on of any trade or business. The petitioner rests his claim that the item represented an ordinary and necessary expense on the fact that most of the stockholders were employees of companies of which he was vice president and for which he acted in dealings with labor unions, and that for the purpose of carrying on his business as vice president of those companies it was necessary that he enter into the agreement to secure the employees against loss on their stock in the Building and Loan Association, of which he was also vice president. Except for the fact that the petitioner and Martin were officials of Curtis-Martin Newspapers, Inc., and of the Philadelphia Inquirer and a number of the shareholders of the Building and Loan Association were employees of those companies, there is no showing of any connection or relationship *299 between the newspaper companies and the Building and Loan Association. Some of the stockholders of the Building and Loan Association were employees of the Curtis Publishing Company, and the relationship between that company and the companies of which the petitioner was an officer, except for the fact that several of them at least were all headed by a man by the name of Curtis, is not shown. The connection between the Building and Loan Association venture and the petitioner's functioning as an officer of the newspaper enterprises, in so far as this record is concerned, is entirely too remote to support the claim that the payment by the petitioner to the Building and Loan Association pursuant to the agreement of October 5, 1931, was as to him an ordinary and necessary business expense. The facts and circumstances involved in , and , present a different situation. The case here is more nearly like that of . See also . *300 There is even less justification for the claim that any indebtedness by anyone to the petitioner resulted from the guaranty or the payment thereunder, or that there was at any time an existing indebtedness to petitioner which might become worthless and give rise to a bad debt deduction. Martin and petitioner were to make good up to $20,000 the amount by which the assets of the closed bank failed to produce that sum. They were obligated to pay only the amount by which the bank failed to pay $20,000 of the amount of the Building and Loan Association's deposit. It is true that the assets of the closed bank had not been completely liquidated at the time the payments were made by Martin and petitioner, but in determining the amounts which were paid by them, due allowance was made for the amount anticipated from further liquidation. There is no showing that there was any underestimation of the amount yet to be received. Furthermore, the settlement between the Building and Loan Association and the bank made no mention of any right of subrogation which with the other facts of record requires the conclusion that the payment of the $3,393.49 was in no sense a debt owing to petitioner which *301 was or had become worthless. There are no facts from which the conclusion of an intention "of creating a potential debtor and creditor relation" might be drawn, as was true in . Similarly, , and , relied on by the petitioner, are distinguishable. We do think, however, that the guaranty of October 5, 1931, and the payment thereunder were part and parcel of a transaction into which the petitioner had entered for profit. He was vice president and a substantial stockholder of the Building and Loan Association. He believed in the soundness of the association even in the face of the potential loss of the deposit in United Security. He was faced, however, with the possibility of seeing his investment in the association, together with accumulated profits therein, jeopardized, if a run on the association should develop. As an officer of the association, it is hardly likely that he could have or would have been permitted to join with other stockholders in the attempted salvage of something of his investment if *302 the run should develop. The result was that he, as vice president, and Martin, as president of the association, took the steps to preserve the association and to safeguard the investments which they had therein. The guaranty here and the resulting payments are comparable to those made by the petitioners in , and . In B. Estes Vaughan, the situation was very similar to that here. There the petitioner, a large stockholder in and president of several banks, made substantial payments to one of those banks to cover the defalcation of an employee and to prevent the closing of the bank. No similar payment was made by any other stockholder. In George H. Stanton, the payments were made by the controlling stockholder of two closed banks to pay creditors of the said banks. In both cases it was held that the payments consituted a part of the transaction whereby the petitioners had become the owners of the stock in the banks and from which ownership it was anticipated and hoped that a profit would be realized. In the Vaughan case, however, the deduction was *303 not allowed because the petitioner was still the owner of the bank stock and it could not then be said whether the ultimate result of ownership of the bank stock would be gain or loss. Certainly no loss had been sustained. In the Stanton case, the loss deduction was allowed for the reason that the stock in question had already become worthless and a loss in respect of the additional payments was sustained when those payments were made. In the instant case, the petitioner was no longer a stockholder in the Building and Loan Association at the time the payment was made, and it may be that the payment represented a loss in the full amount of the payment at the time it was paid. On the other hand, if a profit was realized on the disposition of the stock, the payment would serve to reduce the amount of profit realized. We are not advised, however, as to the date when the petitioner disposed of his building and loan stock. We do not known whether it was sold at a gain or a loss Neither do we know whether it was disposed of in the taxable year, or in some other year, nor whether gain was reported, if there seemed to be an apparent gain at the time of disposition. There being no proof *304 as to those matters, we are unable, for lack of evidence, to determine whether or not the petitioner is entitled to the deduction claimed. Compare . Decision will be entered under Rule 50.